1

2

3

4

5

6

7                  UNITED STATES DISTRICT COURT
       FOR THE EASTERN DISTRICT OF WASHINGTON

8                        AT YAKIMA

9 | Kachess Community Association, a Washington nonprofit corporation, and The

10 | Wise Use Movement, a Washington nonprofit corporation, | Cause No.

11

12               Plaintiffs,

13         vs. | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

14 | U.S. Department of the Interior, Bureau of Reclamation and its Commissioner, Brenda

15 | Burman and the Washington State Department of Ecology and its Director, Maia Bellon,

16

17            Defendants.

18

19         **I.**     **PRELIMINARY STATEMENT**

20     1.    This action arises under and alleges violations of: a) National Environmental

21 Policy Act ("NEPA"), 42 U.S.C. § 432 et seq.; b) the Administrative Procedures Act, 5 U.S.C.

22 § 501 et seq. (the "APA"); c) the Washington State Environmental Policy Act ("SEPA"), RCW

23 43.21C. et seq.; d) the implementing regulations of NEPA, the APA and SEPA; 5) the

24

25 COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE      1
RELIEF

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

1 Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et. seq.; e) the Federal Advisory

2 Committee Act ("FACA"), Pub. L. 92-463, § 1, Oct. 6, 1972, 86 Stat. 770; and the Washington

3 State Open Public Meetings Act ("OPMA"), Chapter 42.30 RCW et. seq.

4       2.     This is an action for declaratory and injunctive relief challenging the Record of

5 Decision (the "2013 ROD") issued by the U.S. Department of the Interior, Bureau of

6 Reclamation ("BurRec") on July 9, 2013, concluding that the *Final Programmatic*

7 *Environmental Impact Statement on the Yakima River Basin Integrated Water Resource*

8 *Management Plan* ("FPEIS"), issued jointly by the BurRec and the Washington State

9 Department of Ecology ("Ecology")(collectively, the "Defendants"), complies with NEPA's

10 procedural and substantive requirements thereby permitting the Defendants to select the

11 "Yakima River Basin Integrated Management Plan Alternative" as the "Preferred Alternative"

12 for further implementation (collectively, the "Yakima Plan").

13       3.     This is an action for declaratory and injunctive relief challenging BurRec's

14 April 26, 2019 Record of Decision (the "2019 ROD") concluding that the Kachess Drought

15 Relief Pumping Plant (the "KDRPP") and the Keechelus Reservoir-to-Kachess Reservoir

16 Conveyance (the "KKC") Final Environmental Impact Statement (the "Tier-1 EIS"), issued

17 jointly by Defendants, complies with NEPA and SEPA and is sufficient for Defendants to

18 conduct further site-specific project analysis in a future tier-2 EIS.

19       4.     Plaintiffs seek a declaratory judgment holding that the Defendants' 2013 ROD,

20 the FPEIS, the Kachess-specific DEIS (2015)(the "Kachess DEIS"), the Kachess Supplemental

21 DEIS (2018)(the "Kachess SDEIS"), the 2019 ROD and the Tier-1 EIS violated NEPA's

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

2

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

procedural and substantive requirements as arbitrary and capricious, violated the rule of reason, and failed to comply with applicable federal laws.

5.    Plaintiffs seek a declaratory judgment holding that the Defendants' FPEIS, the 2013 ROD,  the Kachess DEIS,  the Kachess SDEIS, the 2019 ROD and the Tier-1 EIS were "final agency actions" taken in violation of the APA because they are arbitrary and capricious, constituted an abuse of discretion, violate the rule of reason, or are otherwise not in accordance with applicable federal laws.

6.    Plaintiffs seek a declaratory judgment holding that the Defendants' FPEIS, the Kachess DEIS, the Kachess SDEIS and the Tier-1 EIS violated SEPA's procedural and substantive requirements as arbitrary and capricious, violated the rule of reason, and failed to comply with applicable laws.

7.    Plaintiffs seek a declaratory judgment holding that the Defendants failed to take acts and perform their duties in violation of the ESA's procedural and substantive requirements by failing to carry out and complete an ESA consultation process on the existing Yakima Project of dams and divisions, because, without such an ESA consultation Defendants have no baseline by which to measure changes or adverse impacts from the Yakima Plan as required by the ESA.

8.    Plaintiffs seek a declaratory judgment holding that the Defendants' actions in creating the Yakima River Basin Water Enhancement Project Workgroup (the "Yakima Workgroup") violated the FACA because, as formed and comprised, including Defendants'

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

3

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

participation thereon, the Yakima Workgroup is an impermissible ad hoc advisory group in violation of applicable federal laws.

9.    Plaintiffs seek a declaratory judgment holding that the Defendants' barring the public from attending meetings of the Yakima Workgroup violated the OPMA, which requires that all meetings of governing bodies of public agencies, including cities, counties, and special purpose districts, be open to the public.

10.    Plaintiffs seek temporary, preliminary and permanent injunctive relief under NEPA, the APA, SEPA, FACA and the OPM prohibiting the Defendants for further pursing the Yakima Plan or its subcomponents.

11.    This relief is necessary to preserve the status quo, prevent agency action in violation of NEPA, SEPA, the APA, the ESA, FACA, and the OPM and prevent irreparable harm and injury-in-fact to the environment and Plaintiffs' interests.

## II.    JURISDICTION AND VENUE

12.    Jurisdiction is proper pursuant to 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201 (declaratory relief); and 28 U.S.C. § 2202 (injunctive relief). There is an actual, justiciable controversy amongst the parties that can be resolved through judicial action.

13.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 1391(e) because the acts, omissions and subject matter giving rise to the claims asserted herein occurred and will continue to occur in the Yakima River basin, which encompasses significant portions of Kittitas, Yakima and Benton Counties and a small area of Klickitat County.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

4

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

### III.    PARTIES/STANDING

14.    Under the APA, any "person suffering legal wrong because of agency action or adversely affected or aggrieved within [the] meaning of a relevant statute" has standing under NEPA, SEPA and other applicable federal laws.

15.    Plaintiff Kachess Community Association ("KCA") is a Washington nonprofit corporation that represent approximately 167 owners of real property located at Lake Kachess. KCA's address is 3511 Via Kachess Road, Easton, Washington 98925. KCA and its members will suffer injury-in-fact by the Defendants' pursuit of the Yakima Plan because: a) it will lower the level of Lake Kachess by approximately 82 vertical feet, thereby creating visual blight and unsafe conditions; b) will impair if not destroy private and/or community water wells used for domestic consumption and fire suppression and protection; c) will impair if not destroy critical wildlife habitat used and enjoyed by KCA members and ESA-listed species; and d) will impair and diminish the KCA's members' real property values.

16.    Plaintiff Wise Use Movement ("WUM") is a Washington nonprofit corporation whose address is P.O. Box 17804, Seattle, WA  98127-1804. WUM's mission is to encourage the wise use of publicly owned and privately owned lands by submitting comments to Federal and State resource agencies, and by developing the "Northwest Corporate Accountability Project." WUM and its constituents will suffer injury-in-fact by the Defendants' pursuit of the Yakima Plan because: a) it will lower the level of Lake Kachess by approximately 82 vertical feet, thereby creating visual blight and unsafe conditions, making it hard if not impossible to

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

5

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

use and enjoy public lands; and c) will impair if not destroy critical wildlife habitat located on public lands used and enjoyed by WUM and its constituents.

17.     Members of the Plaintiffs submitted comments on the FPEIS, the subsequent Kachess DEIS and the Kachess SDEIS and have been actively involved in the dispute and controversy surrounding Lake Kachess and the Yakima Plan.

18.     Lake Kachess is a lake and reservoir along the course of the Kachess River in Kittitas County, Washington State. The upper part of the lake, north of a narrows, is called Little Kachess Lake. The Kachess River flows into the lake from the north, and out from the south. Kachess Lake is the middle of the three large lakes that straddle Interstate 90 north of the Yakima River in the Cascade Range; the other two are Cle Elum Lake, the easternmost which is also north of I-90, and Keechelus Lake, the westernmost, which is south of I-90. Kachess Lake is part of the Columbia River basin, the Kachess River being a tributary of the Yakima River, which is tributary to the Columbia River.

19.     Lake Kachess is used as a storage reservoir as part of the Yakima Project, which is a larger irrigation project serving portions of eastern Washington State. While still a natural lake, Kachess Lake's capacity and discharge is controlled by Kachess Dam, which is an earthfill structure built in 1912, that provides an additional 76,000 acre feet of natural lake water by capturing run-off and provides an active capacity of 239,000 acre feet as a storage reservoir.

20.     In Native American language, the name "Kachess means "more fish," compared to "Keechelus" which means "few fish".

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

6

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

21.    Lake Kachess is home to numerous species, including Bull Trout and the Northern Spotted Owl, both of which are listed as Threatened Species under the ESA.

22.    Plaintiffs and their members and constituents use and enjoy Lake Kachess and the underlying and surrounding public and private lands and the resident wildlife populations therein and thereon.

23.    Plaintiffs and their members and constituents will suffer irreparable injury-in-fact by the Defendants' pursuit of the Yakima Plan because it will lower the Lake level by approximately 82 feet, thereby impairing and isolating the resident populations and their habitat.

24.    Plaintiffs and their members and constituents will suffer irreparable injury-in-fact by Defendants' pursuit of the Yakima Plan because it will draw down the Lake, creating unsafe conditions, increasing fire risks, impairing water supply to residents, and decreasing property value, among other injuries.

25.    The addition of a new pumping station on Lake Kachess under the Yakima Plan will lower the level of water in the lake, 82 vertical feet or more, below the natural lake level created by glacier activity, creating unknown and unstudied shoreline destabilization that could harm Plaintiffs.  When the level of the lake is dropped 65 vertical feet, shoreline sections have broken loose and fell away.  If the level is dropped below the natural lake level, the danger to the shoreline and homes within 100 feet of the high-water line is unknown and unstudied, creating a possibility for landslides, that could harm and injure Plaintiffs.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

7

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

26.     Plaintiffs' and their members' and constituents' interests are within the zone of interest protected by NEPA and SEPA because they require agencies to take a "hard look" at the environmental impacts of decisions and actions by preparing and distributing adequate EISs to decision-makers and the public *before* making a decision to proceed on one alternative versus another.  Under NEPA and SEPA, alternatives are the heart of an EIS, yet the PFEIS failed to include a reasonable range of alternatives.

27.     Plaintiffs' and their members' and constituents' interests are within the zone of interest protected by the ESA because the Yakima Plan will unreasonably threaten and harm the resident population of Bull Trout and Northern spotted owls at Lake Kachess.

28.     Today, the Lake supplies an important "second source of water" for firefighting purposes.  In a major fire event, the fire department would put a floating pump in the lake and pump water to firefighting apparatus.  This would likely be impossible if the Lake is drawn down an additional 82 feet.

29.     The area around these lakes is already at considerable risk for catastrophic fires in the late summer, and especially during droughts. The draining of Lake Kachess by 145 feet below full and 82 feet below the current lowest level will almost immediately create even dryer, more fire-prone conditions. Further, the dryer conditions will allow the current insect infestations to get worse, causing greater tree mortality, and enlarging the fuel supply, creating the ideal conditions for much bigger and more dangerous fires, which would harm and injure Plaintiffs.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

8

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

30.    Plaintiffs' and their members' and constituents' interests are within the zone of interest protected by the FACA because it prohibits Defendants from creating and participating on the Yakima Workgroup since it is an ad hoc advisory committee.

31.    The Working Group process also violates the OPMA because it requires that all meetings of governing bodies of public agencies, including cities, counties, and special purpose districts, be open to the public, which Defendants failed to do for the Yakima Workgroup.

32.    The Court can provide relief by issuing a declaratory judgment holding Defendants' actions are arbitrary and capricious, the EISs are inadequate, and violate NEPA's and SEPA's procedural and substantive requirements based on their decision to only evaluate the "No Action Alternative" and the Yakima Plan Alternative in the FPEIS; other alternatives were and remain available, which, if properly considered by taking a "hard look," could have influenced the Defendants' decision and subsequent actions regarding the Yakima River Basin Integrated Water Resource Management Plan.

33.    The Court can provide relief by issuing a declaratory judgment holding Defendants' actions are arbitrary and capricious, the EISs are inadequate, and violate NEPA's and SEPA's procedural and substantive requirements because they fail to adequately evaluate and disclose the significant adverse impacts of the Yakima Plan.

34.    Defendant BurRec is the agency that issued the 2013 ROD concluding the FPEIS was adequate and Brenda Burman, in her official capacity, is the current Commissioner of the BurRec, who is pursuing and directing further BurRec efforts and actions based on that determination.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

9

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

35.    Ecology is a state agency that co-issued the EISs at issue in this matter and Maia Bellon, in her official capacity, is its current Director.

## IV.    FACTS

36.    BurRec and Ecology prepared the Yakima Plan FPEIS to assess the environmental effects of implementing the Yakima Plan.

37.    The Yakima Plan FPEIS was issued in March 2012.

38.    On July 9, 2013, BurRec published the Record of Decision to implement the Yakima Plan in cooperation with Ecology and other Federal, State, local, and Tribal partners.

39.    The PEIS only analyzes only one action alternative, the Yakima Plan, and a "No Action" (i.e., status quo) alternative.

40.    The Yakima Plan analyzed in the PEIS includes seven components, all of which contain specific projects.

41.    One component of the Yakima Plan is the Surface Water Storage Element ("Water Supply Component").

42.    The Water Supply Component include four project-specific actions, including a) the Wymer Dam and Pump Station, b) the Kachess Reservoir Inactive Storage, c) the Bumping Lake Reservoir Enlargement, and d) a Study of Columbia River Pump Exchange with Yakima Storage.

43.    The fourth action (Columbia River Pump Exchange) is conditioned upon later failure of project actions a), b) and c) and political acceptance of the Yakima Plan by the Yakima Workgroup, a stakeholder group co-chaired by the BurRec and Ecology.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

10

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

44.    The Project Workgroup provides policy and project development advice on implementing the Yakima Plan.

45.    The Preferred Alternative identified in the 2013 ROD, the Yakima Plan, is a composite of major actions significantly affecting the quality of the environment as stated in the FPEIS.

46.    The course of action proposed by this "programmatic" EIS is to leave precise actions related to the Yakima Plan within the selected "combination" to be considered in later environmental compliance.

47.    By focusing on a single action alternative comprised of distinct components, the PEIS eliminates possible future alternatives from later environmental review and consideration and instead "snowballs" the Yakima Plan by foreclosing other, viable alternatives such as aggressive water conservation, water efficiencies, and water banking all of which have been proven to be effective tools to conserve and manage water.

48.    A 2013 ROD is intended to be conclusive as to the choice of alternatives based on adequate discussion and disclosure in an EIS.

49.    Where reasonable alternatives are eliminated at a "programmatic level," without their consideration, or comparison against the chosen alternative, then the "reasonable alternative" requirement has been avoided, in violation of NEPA.

50.    The 2013 2013 ROD selects the Yakima Plan for further implementation.

51.    The 2013 2013 ROD was based on the PEIS, which only analyzed and discussed one action alternative.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

11

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

52.    The Yakima Plan selected in the 2013 2013 ROD includes a number of elements that may be implemented in a phased approach.

53.    The Yakima Plan includes a three-phase strategy that will occur in 10-year increments over 30 years and may combine or implement Yakima Plan actions simultaneously.

54.    One of the action alternatives examined in the FPEIS is constructing and operating a pumping plant to access up to 200,000 acre-feet of water in Lake Kachess during drought years (the "Pumping Project").

55.    The Pumping Project would modify the existing outlet to Kachess Reservoir to allow it to be drawn down approximately 82 feet lower than the current outlet, thereby permitting withdrawal of approximately 200,000 additional acre-feet of water from the Lake to be used for irrigation downstream in the Basin during drought conditions.

56.    The Pumping Project would provide access to additional water in the Lake without increasing the Lake's footprint.

57.    The FPEIS identified two options to implement the Pumping Project: Option 1 would use a gravity-flow tunnel that would discharge into the Yakima River approximately 4.6 miles southeast of the Kachess Dam; and Option 2 would withdraw water from the outlet of the Lake and use a pump station near the Lake shoreline to pump through a pipeline to a discharge to the Kachess River just downstream of the Lake Kachess dam.

58.    The PEIS does not *analyze* either Option 1 or 2, instead pushing that analysis off until later.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

12

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

59.     Defendants have stated that additional design is needed before they can choose between Option 1 and Option 2.

60.     Under either Option 1 or 2, the Lake would be drawn down by approximately 82 feet.

61.     This draw-down will prevent the fish in the Lake, including threatened and listed Bull Trout, from spawning in Box Canyon by creating an 82-foot high cliff impediment, blocking passage for spawning.

62.     There is no plan in the PEIS or the 2013 ROD to mitigate this loss of habitat and reduction in population of the threatened species.

63.     The Gold Creek bull trout are distinct from Lake Kachess Bull Trout.

64.     Over 5 miles, 2 dam structures, and Kecheelus Ridge separate the Lake Kachess bull trout and the Gold Creek bull trout populations.

65.     The Gold Creek bull trout mitigation plan in the PFEIS cannot affect the Lake Kachess bull trout population because of these factors.

66.     The proposed mitigation plan in the PEIS, which only affects Lake Kecheelus, cannot mitigate the loss of fish in Lake Kachess.

67.     The PEIS also states the Kachess Lake aquifer will be depleted and private wells may be compromised or fail entirely.

68.     The only accommodation for this depletion and/or complete elimination will be for "…Reclamation to develop appropriate mitigation strategies" if water levels and wells are adversely impacted.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

13

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

69. Defendants' *"we will figure it out later"* approach permeates much of the PEIS and is inadequate under NEPA and SEPA.

70. Washington State's regulations implementing SEPA use somewhat different terminology compared to NEPA, but have the same import.

71. Washington courts[1] have been sensitive about the dismissal of consideration of alternative projects by means of use of a "nonproject" EIS and has been rejected as impermissible "snowballing," giving preference to uncompared projects in the "nonproject" or "programmatic" environmental documents and then never reaching evaluation of the alternatives that should have been considered.

72. Environmental analysis of a "program" that is merely a combination of "projects" requires that the projects chosen are within the program to be measured and compared against those projects that have been excluded from the "program.

73. Failing to consider alternative combinations of projects in an EIS, under the guise of the EIS being merely "programmatic" avoids the clear mandates of NEPA and SEPA—that all reasonable alternatives be considered.

74. The Yakima Plan involves precise actions.

---

[1] *Magnolia Neighborhood Planning Council v. City of Seattle*, 155 Wash.App. 305, 230 P.3d 190 (Div.1 2010); *King County v. Washington State Boundary Review Board for King County and City of Black Diamond*, 122 Wn.2d 648, 663, 860 P.2d 1024 (1973).

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

14

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

75.     Defendants must evaluate the environmental effects of those actions against the environmental effects of alternative actions that are otherwise available, but not chosen to be included in the PEIS.

76.     Postponement of an alternative course of action, or making it contingent upon a later political decision, does not preclude the comparison of its effects in the PEIS.

77.     The PEIS includes a "study" of reasonable alternative projects in the "program," but stops short of making a meaningful choice between them because Defendants believe that is a political decision/conclusion to be made later.

78.     NEPA and SEPA require consideration, disclosure and analysis of the possible environmental impacts at the earliest possible time, including those that may be politically difficult.

79.     The requirement that an EIS contain a detailed discussion of possible mitigation measures flows both from the language of the NEPA and, more expressly, from CEQ's implementing regulations for NEPA, and from SEPA's statutory language and implementing rules.

80.      The mitigation proposed in the PEIS is general and hypothetical, and undermines the mitigation being implemented by WSDOT under the Interstate-90 FEIS.

81.     The Draft PEIS precluded effective public comment on possible alternatives and on specific mitigation measures by failing to properly disclose, discuss and analyze available alternatives.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

15

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

82.     The NEPA/SEPA decision makers cannot understand the implications of the proposed action, the Yakima Plan, because the EISs at issue here do not properly disclose, discuss or analyze available alternatives.

83.     The PEIS fails to include a "reasonably complete discussion" of possible mitigation measures that could address and ameliorate the adverse impacts from the Yakima Plan.

84.     Without such disclosure and analysis, the PEIS fails to provide the decision makers and the public with a full understanding of the environmental consequences of any of the alternatives under consideration.

85.     Section 7 of the ESA requires federal agencies to consult with either the United States Fish and Wildlife Service (USFWS) or the National Marine Fisheries Services ("NMFS")(collectively, the "Services") to ensure that any action authorized or carried out by the agency is not likely to jeopardize the continued existence of any endangered or threatened species, or result in the destruction or adverse modification of critical habitat of the species.

86.     The consultation process requires the Services to prepare a biological opinion that includes a finding as to whether a proposed action is likely to jeopardize the continued existence of an endangered or threatened species or its habitat.

87.     Although the PEIS acknowledges repeatedly that there will be substantial negative impacts to ESA listed species including Bull Trout and the Northern Spotted Owl (among others) and the habitat of these species, it fails to quantify those impacts adequately.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

16

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

88.    This failure stems from the fact that the Defendants have not initiated a Section 7 consultation under the ESA, which is the only way to know if the Yakima Project is viable and will not violate the ESA.

89.    The FPEIS does state that such a consultation will occur in the future but the lack of a concrete understanding of the impacts on listed species makes the selection of a preferred alternative arbitrary and capricious.

90.    NEPA and ESA regulations encourage simultaneous NEPA review and section 7 consultations as do BurRec's own NEPA regulations to avoid this exact problem.

91.    Defendants created the Yakima Workgroup.

92.    The Yakima Workgroup was not created nor chartered under the FACA.

93.    Defendants placed themselves onto the Yakima Workgroup, both as voting members and as the co-Chairs.

94.    Defendants invited five irrigation districts (Yakima-Tieton Irrigation District, Kittitas Reclamation District, Kennewick Irrigation District, Sunnyside alley Irrigation District,  and Roza Irrigation District), three counties (Benton, Kittitas, and Yakima), one city (Yakima, but not Ellensburg or Cle Elum), two members of the Yakima Nation, one conservation group (American Rivers), and other state and federal agencies to be members of the Yakima Workgroup, making it  heavily represented by irrigators, including those who stand to personally benefit from Workgroup decisions.

95.    The cities of Cle Elum and Ellensburg, environmental and conservation groups with longstanding involvement in water policy and national forest issues, and recreational users

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

17

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

1    and residents around Keechelus, Kachess, Cle Elum, and Bumping Lakes were excluded by

2    Defendants from the Yakima Workgroup.

3        96.    The Yakima Workgroup has generally met quarterly since 2009.

4        97.    Agendas show that the Yakima Workgroup received presentations from

5    consultants and voted on Yakima Plan elements during the meetings.

6

7        98.    No public input was allowed during Yakima Workgroup discussions or prior to

8    voting on action items.

9        99.    The Yakima Workgroup adopted the 2012 Yakima Plan.

10        100.    Following this, the Yakima Workgroup shifted into "implementation mode."

11        101.    The Yakima Workgroup created an "Implementation Committee" headed up by

12    Ecology, with additional Workgroup members, including Kittitas Reclamation District,

13    American Rivers, Kittitas County, Yakima County, Trout Unlimited, Yakima Nation (2),

14    WDFW, and the Roza Irrigation District.

15

16        102.    The Implementation Committee's function is largely to lobby elected officials.

17        103.    The Implementation Committee meetings are closed to the public, even though

18    two state agencies are members paid for with taxpayer money.

19        104.    On or about September 18, 2011, then-Secretary of Interior Salazar requested

20    the Yakima Workgroup provide him a list of Yakima Plan early action items by November 1,

21    2011, prior to the release of the DPEIS.

22

23        105.    In October 2011, the Yakima Workgroup gave the Secretary a list of projects

24    with an approximate total value of $20 million.

25    COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE                    18
RELIEF

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

106.    Only the Yakima Workgroup's preferred Yakima Plan, and the no-action alternative, were included in the FPEIS.

107.    Defendants received more than 1,500 comments on the DPEIS from citizens around the country objecting to the Yakima Plan.

108.    The Final PEIS was released on March 2, 2012, ignoring many comments and objections.

109.    As stated in the FPEIS, Defendants refused to analysis individual elements of the Yakima Plan saying, for example,

> Future analysis of individual elements of the Yakima Plan will determine if they, individually and in combination, meet the economic, financial, and cost sharing criteria of Federal and State water resources projects. The PEIS addresses these criteria for the overall Yakima Plan, given current information.

and:

> As stated throughout the FPEIS, Reclamation and Ecology will conduct the appropriate level of NEPA and/or SEPA analysis on individual projects carried forward. Significant adverse impacts will be analyzed at a project level.

110.    On or about March 30, 2012, fifteen local, state and national organizations wrote to Defendants with FPEIS objections, requesting a written response that was never acknowledged nor received.

111.    The 2015 Kachess DEIS had at least at least seven major flaws rendering it inadequate under NEPA and SEPA, including:

    a.    The "Proposed Action" is unclear and contradicts the alternatives analysis;

    b.    The alternatives analysis is inadequate;

    c.    The DEIS relies on vague and hypothetical mitigation measures;

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

19

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

d.  The proposal does not comply with NEPA or the ESA with regard to threatened and endangered species;

e.  The Kachess DEIS does not adequately analyze cumulative impacts as required by law;

f.  The DEIS is obsolete because it fails to adequately disclose, discuss or analyze appropriate alternatives; and

g.  The DEIS is contradicted by and is not informed by Defendants' own Feasibility Study.

112.    In April 2018 Defendants published the Kachess SDEIS in an attempt to remedy the flaws in the 2015 Kachess DEIS.

113.    Defendants did so, because, as they stated "Reclamation and Ecology have reviewed all comments on the DEIS, developed a new floating pumping plant alternative, collected additional scientific data as necessary, and evaluated new findings. The new alternative and new findings have been documented in the Kachess Drought Relief Pumping Plant and Keechelus Reservoir-to-Kachess Reservoir Conveyance Supplemental Draft Environmental Impact Statement (SDEIS) released to the public April 13, 2018."

114.    Defendants further stated the "Kachess SDEIS will not contain comment letters received on the DEIS; instead, letters and response to comments from both the DEIS and SDEIS would be in a final environmental impact statement."

115.    The new Kachess SDEIS is extremely long, at a staggering 906 pages.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

20

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

116.   This, along with other flaws, makes the Kachess SDEIS confusing in violation of NEPA and SEPA readability and understandability policies.

117.   The Kachess SDEIS proposes a project that violates the ESA.

118.   Defendants refused to publish the public comments from the 2015 Kachess DEIS in the later-issued SEIS.

119.   Because of this, the public was unable to understand the need for and reasoning behind the publication of the SDEIS, which remained known only to the Defendants.

120.   This undermined the efficacy of the required comment period for the Kachess SDIES because there was available information withheld from the public.

121.   The SDEIS nevertheless acknowledges that the DEIS comments raised issues that led in part to the decision to issue the SDEIS, but which were not disclosed to the public.

122.   The Purpose and Need section of an EIS is critical because it frames the entire discussion about the proposed project and leads to potential project alternatives.

123.   The Kachess SDEIS has three "Purpose and Need" sections for three different "project proponents."

124.   Despite this, the SDEIS states there is only one way to meet all of the project goals:   By selecting the "Proposed Action" (i.e., the Yakima Plan) as the "Preferred Alternative."

125.   By avoiding proper public comment and input, and by failing to adequately disclose necessary information regarding available alternatives, the SDEIS is simply an entirely new DEIS despite proposing an entirely new alternative.

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

21

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

126.    The Kachess SDEIS proposed an entirely new alternative, the floating pumping plant, not contemplated or researched in the Kachess DEIS.

127.    As such, the public had no way of evaluating this alternative relative to the prior DEIS.

128.    SDEIS further predetermines the outcome of the NEPA and SEPA review by inviting a new proposal from Roza (the floating pumping plant) and names it the "Proposed Action" and includes Roza as a "Project Proponent."

129.    By doing this, the Kachess SEIS effectively elevates only two alternatives: The floating pumping plant or no action.

130.    Defendants, in their Kachess SDEIS again disregarded the Federal Agency consultation process mandated under the ESA, which requires the Services to prepare a biological opinion that includes a finding as to whether the "proposed action" is likely to jeopardize the continued existence of an endangered or threatened species or its habitat.

131.    Like the PEIS, and the Kachess DEIS, the Kachess SDEIS proposes mitigation, which only alludes to vague considerations for mitigation of bull trout habitat destruction and population decline, but does not provide definitive or even viable proposals with cost estimates, which is particularly important in this case because the harmful effects are so dramatic and potentially impossible to mitigate such as 82-foot cliff in spawning gateways.

132.    In March 2019, Defendants issued the Tier-1 EIS, which evaluated several alternatives to access up to 200,000 acre-feet of the inactive storage water in Lake Kachess.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

22

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

133.    The alternatives evaluated in the Tier-1 EIS are tiered from the FPEIS to support its goals.

134.    The 2019 ROD does not "approve" implementation of any alternatives evaluated in the Tier-1 EIS and instead "carries forward" Alternative 4, the KDRPP Floating Pumping Plant, for further site-specific analysis in a tier-2 EIS to be prepared in the future.

135.    Defendants state that they will prepare a future tier-2 EIS to focus on the site-specific effects of a KDRPP Floating Pumping Plant and "other reasonable alternatives" to access the inactive storage below the current outlet of Lake Kachess.

136.    The future tier-2 DEIS further limits the range of alternatives that bedeviled the PEIS, DEIS, and SDEIS. The new proposal will only evaluate a single alternative – the floating pumping plant and no action. This is flatly insufficient under NEPA and SEPA.

137.    On March 12, 2019, the United States Congress passed legislation later signed into law by the President, Public Law 116-9, authorizing the Yakima Plan.

138.    Congress passed this law before the Tier-1 EIS was released and thus Congress did not have access to the comments on the alternatives evaluated therein.

## V.    FIRST CAUSE OF ACTION: NEPA VIOLATIONS

139.    Paragraphs 1-138 are hereby incorporated by reference.

140.    Under NEPA, agencies considering "major Federal actions significantly affecting the quality of the human environment" must prepare and issue an EIS. 42 U.S.C. § 4332(2)(C).

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

23

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

141.    The EIS: "shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

142.    An EIS is more than a mere "disclosure document." 40 C.F.R. § 1502.1.

143.    Agencies must take a "hard look" at the potential environmental consequences of the proposed action.

144.    By focusing on the environmental effects of the proposed agency action, "NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct."

145.    The alternatives section of an EIS "is the heart of the environmental impact statement," and it should present the environmental impacts of the proposal and the alternatives in comparative form, to sharply define the issues and provide a clear basis for choice among options by the decision makers and the public.  40 C.F.R. § 1502.14.

146.    One essential ingredient of an EIS is to identify adverse environmental impacts and then discuss the steps that will be taken to mitigate unavoidable adverse environmental consequences.

147.    Implicit in NEPA's demand that an agency prepare a detailed statement on "any adverse environmental effects which cannot be avoided should the proposal be implemented," 42 U.S.C. § 4332(C)(ii), is an understanding that the EIS will discuss the extent to which adverse effects can be avoided or mitigated.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

24

**Tatoosh Law and Policy Group**
318 1ˢᵗ Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

148.     Section 102 (C) (v) of NEPA requires that the EIS include a detailed statement on "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

149.     Defendants' choice to leave the Columbia River Pump Exchange project out of consideration for development until after the other surface storage projects fail permits the DPEIS to omit discussion of the wasted fiscal resources that will be committed to projects that are likely to fail.

150.     Both NEPA and SEPA require consideration of all available alternatives in the first instance so that the competing "irreversible and irretrievable commitment of resources" of the various alternatives can be weighed against each other.

151.     The approach taken by Defendants in the FPEIS violates these provisions in NEPA.

152.     Defendants further violated NEPA in the EISs at issue here by:

a.    Failing to identify, disclose and analyze reasonable alternatives in the EISs;

b.    Evaluating only one action alternative—the Yakima Plan—and the no-action alternative in the FPEIS, thereby foreclosing the possible selection of other reasonable and feasible alternatives;

c.    By pushing off project-specific environmental review and disclosure until after political decisions had been made and the Preferred Alternative had impermissibly "snow-balled" and gained unstoppable momentum as evidenced by the alternatives evaluated in the EISs;

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

25

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

       d.  By failing to identify, disclose and analyze potential, feasible mitigation measures in the EISs that could reduce the adverse impacts from the Yakima Plan; and

       e.  By failing to properly consider and respond to public comments in the EISs.

153.    In reviewing the proposed action, NEPA requires an agency to consider the proposed action's impact in the context of all relevant circumstances, such that where "several actions have a cumulative ... environmental effect, this consequence must be considered in an [EIS]."

154.    A cumulative effect is "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7.

155.    An EIS "must analyze the combined effects of the actions in sufficient detail to be 'useful to the decision maker in deciding whether, or how, to alter the program to lessen cumulative impacts.'"

156.    "General statements about 'possible effects' and 'some risk' do not constitute a 'hard look' absent a justification regarding why more definitive information could not be provided."

157.    The PFEIS, the Kachess EIS, the Kachess SEIS and the Tier-1 EIS all fail to adequately disclose, discuss and analyze numerous cumulative impacts, including:

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

26

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

a.   The relationship to Interstate 90 mitigation projects as the conveyance project results in a physical intrusion on the wildlife connectivity corridors and may lead to a change in ecosystem function in the reservoirs and especially for Lake Keechelus in relation to Gold Creek;

b.   Increased fire risk in the KDRPP and KKC areas caused by construction work related to the Preferred Alternative;

c.   Water Quality impacts cause by mixing water from the Keechelus Reservoir into Lake Kachess; and

d.   Impacts to water-supply wells, both community wells and private, single-family wells, used for domestic service and fire suppression/emergency services.

## VI.   SECOND CUASE OF ACTION: SEPA VIOLATIONS

158.   Paragraphs 1-138 are hereby incorporated by reference.

159.   SEPA contains similar and corollary provisions to those discussed above related to NEPA.

160.   RCW 43.21C.030(2)(C) requires that an EIS "include in every recommendation or report on proposals for legislation and other major actions significantly affecting the quality of the environment, a detailed statement by the responsible official on: (v) "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

27

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

161. As described in detail in Section IV, Defendants violated SEPA by:

a.   Failing to identify, disclose and analyze reasonable alternatives in the EISs at issue here;

b.   Selecting only one action alternative—the Yakima Plan—and the no-action alternative in the FPEIS, thereby foreclosing the possible selection of other reasonable and feasible alternatives;

c.   By pushing off project-specific environmental review and disclosure until after political decisions had been made and the Preferred Alternative had impermissibly "snow-balled" and gained unstoppable momentum as evidenced by the alternatives evaluated in the EISs at issue here;

d.   By failing to identify, disclose and analyze potential, feasible mitigation measures in the EISs at issue here that could reduce the adverse impacts from the Yakima Plan;

e.   By failing to properly consider and respond to public comments in the EISs at issue here;

f.   By failing to properly disclose and discuss possible cumulative impacts from the Yakima Plan in the EISs at issue here; and

g.   By failing to disclose and discuss irreversible and irretrievable commitments of resources related to the Yakima Plan by excluding feasible other projects from inclusion in the EISs.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

28

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

## VII.    THIRD CAUSE OF ACTION: ESA VIOLATIONS

162.    Paragraphs 1-138 are hereby incorporated by reference.

163.    The NEPA Guidelines state further:

To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses *and* related surveys and studies required by...the Endangered Species Act...." 40 C.F.R. § 1502.25.

164.    The "studies" required by section 7 of the ESA are those needed for consultation on any federal action that may affect ESA-listed species. 16 U.S.C. § 1536(b), (c).

165.    ESA section 7(c) states that the action agency's biological assessment, a precursor to a biological opinion, "may be undertaken as part of a Federal agency's compliance with the requirements of Section 102 of the [NEPA]." 16 U.S.C § 1536(c)(1).

166.    BurRec's own NEPA regulations state:

Special attention should be given to the integration of NEPA and the ESA. Section 7(a)(2) of the ESA requires consultation with the Service and/or NOAA-NMFS for any Reclamation action which may affect a species federally listed as threatened or endangered (listed species). This consultation process may result in the Service and/or NOAA-NMFS issuing a biological opinion containing actions to be undertaken to avoid jeopardizing a species or to reduce the level of take associated with the proposed action. Reclamation *shall*, to the fullest extent possible, integrate ESA and NEPA analyses and schedules." (Bureau of Reclamation's NEPA Handbook Section 3.15.1) (emphasis added).

167.    Defendants, in the FPEIS concluded that "consultation under Section 7 of the Endangered Species Act is not required at this time because preparation of the PEIS and selection of a preferred alternative would have no effect on listed species in the action area." Defendants' position is that consultation would be conducted for individual projects that may

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

29

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

affect listed species or critical habitat and that would be funded, authorized, and/or carried out under the Yakima Plan in the future.

168.    Defendants failed to provide that additional analysis or consultation in the subsequently issued Kachess DEIS or in the Kachess SDEIS despite their commitment to do so in the FPEIS and 2013 ROD.

169.    Defendants' failure to consult with the Services has led to an incomplete evaluation of the true impacts on endangered species and potential mitigation for these impacts related to and arising from the Yakima Plan, including, without limit, their plan to drawn down Lake Kachess by an additional 82 feet, thereby stranding and "taking" the resident listed Bull Trout population and adversely impacting habit use by that population and the resident Northern Spotted Owl population.

170.    Both of these actions are per se violations of the ESA and lead to a failure to evaluate the true impacts of the proposed action in clear violation of NEPA and SEPA.

## VIII.    FOURTH CAUSE OF ACTION: FACA VIOLATIONS

171.    Paragraphs 1-138 are hereby incorporated by reference.

172.    FACA prohibits using ad hoc advisory groups.

173.    The Yakima Workgroup, as organized, comprised and conducted violates the FACA because it is an impermissible ad hoc advisory group.

## IX.    FIFTH CAUSE OF ACTION: OPMA VIOLATIONS

174.    Paragraphs 1-109 are hereby incorporated by reference.

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

30

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

175.    The OPMA requires that all meetings of governing bodies of public agencies, including cities, counties, and special purpose districts, be open to the public.

176.    Defendants violated the OPMA by closing meetings of the Working Group to the public.

## X.    REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request this Court:

177.    Declare the FPEIS and 2013 ROD violate the procedural and substantive requirements of NEPA and SEPA;

178.    Declare the Kachess DEIS, Kachess SEIS, the Tier-1 EIS and the 2019 ROD violate the procedural and substantive requirements of NEPA and SEPA;

179.    Declare Defendants acted arbitrarily and capriciously in concluding the environmental documents (i.e., EISs and RODs) satisfy the procedural and substantive requirements of NEPA and SEPA;

180.    Declare the FPEIS, 2013 ROD, Kachess DEIS, the Kachess SEIS and the Tier-1 EIS and 2019 ROD are inadequate under the rule of reason;

181.    Declare any and all decisions and actions based on the FPES, 2013 ROD, Kachess DEIS, the Kachess SEIS and the Tier-1 EIS and 2019 ROD are null and void;

182.    Declare Defendants violated the ESA;

183.    Declare Defendants violated the FACA;

184.    Declare Defendant Ecology violated the OPMA;

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

31

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685

185.    Issue appropriate injunctive relief, either preliminary and/or permanent, enjoining the Defendants from taking any further action in pursuit of or based on the Yakima Plan Alternative;

186.    Award Plaintiffs their costs of litigation, including reasonable attorneys' fees and expert witness fees incurred herein; and

187.    Grant such further relief deemed just and proper.

DATED this 8th day of July, 2019.

TATOOSH LAW AND POLICY GROUP

By *David D. Dicks*
David D. Dicks, WSBA #29422
318 1st Avenue S, Suite # 310
Seattle, WA 98104
daviddicks@me.com
206-550-2685


BROWER LAW PS

By *Joshua C. Allen Brower*
Joshua C. Allen Brower, WSBA #25092
506 Second Avenue, Suite # 1400
Seattle, WA 98104
josh@browerlawps.com
206-498-1804

Attorneys for Plaintiffs

COMPLAINT FOR DECLARATORY
JUDGMENT AND INJUNCTIVE
RELIEF

32

**Tatoosh Law and Policy Group**
318 1st Avenue S., Suite 310
Seattle, Washington 98104
Tel: 206.502.2685